.THE GEORGE E. STARR.

WASHINGTON STEAM-BOAT & TRANSP. CO. *v.* THE GEORGE E. STARR.

*(District Court, D. Washington, N. D.  August 31, 1891.)*

1. COLLISION—BETWEEN STEAMERS—FOG—EXCESSIVE SPEED.
    The steamer S. came into collision with the steamer A., striking her port paddle-box, breaking the timbers, tearing the shaft from its bed, and forcing it several feet aft. Though there was a dense fog at the time, and the S. was aware of the A.'s proximity, having heard and answered her signals to pass port to port, she proceeded at her usual speed of nine miles an hour until the A. became visible through the fog, when she ported her helm and reversed, but without avail. *Held,* that the S. was in fault for this collision.

**2. SAME—LATERAL MOTION UNDER PORT HELM.**
  The contention of the S. that the collision was caused by the A.'s action in putting her helm hard a-port while going ahead, so as to swing her stern to port, which forced her laterally on her center against the stem of the S., is untenable, as being contrary to natural philosophy.

**3. SAME—STOPPING IN FOG—FAULT.**
  The situation of the A.—in a dense fog, with the S. approaching from ahead, but invisible—being one requiring extreme caution, in which the rules of navigation require a vessel to slow up or stop in order to avoid the possibility of collision, it cannot be held that stopping was a fault, though it in fact materially contributed to bring the vessels together.

**4. SAME—GOING AHEAD INSTEAD OF ASTERN.**
  But the A. was in fault for going ahead as soon as the S. hove in sight, though she did it with helm hard a-port, so as to swing to starboard, and present the timbers of the paddle-box as a fender to the approaching blow; for by going astern, as the rules of navigation require in such a situation, under a starboard helm, she would have swung the same way, and equally have presented such fender to the S.


In Admiralty.

*R. S. Greene*, for libelant.

*Thomas Burke*, for claimant.


HANFORD, J.   On the morning of the 16th of March, 1889, in a dense fog, the side-wheel passenger steamer George E. Starr collided with the side-wheel passenger steamer Eliza Anderson.   Both vessels were engaged at the time as carriers of passengers and freight on the route between Seattle and Whatcom, via Utsalady, Coupeville, and other intermediate points; and the two vessels are similar to each other as to size, speed, and build, the Starr being a newer vessel than the Anderson, and somewhat superior to her in size, speed, and power.   The collision occurred between Utsalady and Coupeville, from two to three miles from Utsalady, and from one-quarter to three-quarters of a mile from Dimmock point, called also "Rocky Point."   The latter name is commonly used by steam-boat men, and is a true characterization of said point.   At the time of the collision the Anderson was going towards Coupeville, from Utsalady, and the Starr was on the opposite course.   The libelant is the owner of the Anderson, and brings this suit to recover damages resulting from the collision, charging that the same was due entirely to a fault on the part of the Starr.   The owner of the latter boat answers, denying the allegations of the libel, and pleading as a defense and counterclaim that the collision was caused by the fault of the Anderson.   It is clearly shown by the evidence that the stem of the Starr came in contact with the timbers forming the outer frame and support of the Anderson's paddle-box, on her port side, just forward of her shaft, with sufficient force to break the timbers, tear the shaft from its bed and fastenings, and move it several feet aft, showing that the Starr ran into the Anderson on an oblique line to the latter's keel, and that the vessels, before colliding, must have approached each other end to end, or nearly so.   In arriving at my conclusion that the Starr was in fault for this collision, and responsible, at least in part, for the damages caused thereby, I consider only the fact of the collision, the manner in which the vessels came together, the force of the blow as shown by the result, and the testimony given in behalf of the respondent, and from said facts and evi-

dence it is clear to my mind that the Starr was being run at her ordinary rate of speed, which is about nine knots per hour, to the moment of coming in sight of the Anderson, at which time the vessels were so near together that it was difficult, if not impossible, to avoid a collision with serious results. The master of the Starr knew of the approach of the Anderson, of her near proximity, and signals to pass port to port had been exchanged between the two vessels, and repeated several times, before they became visible from each other through the dense fog. The signals given and responded to required the Starr to pass between the Anderson and Rocky point. The situation was one demanding extreme caution, and the rules of navigation are imperative requiring a steamer under such circumstances to moderate her speed, and even to stop, in order to avoid the possibility of a collision. Revised International Regulations, art. 18, 23 U. S. St. 441; *The Catalonia*, (Dist. Ct.) 43 Fed. Rep. 396; *The Lehigh*, (Cir. Ct.) Id. 597; *The North Star*, (Dist. Ct.) Id. 807; *The Nacoochee*, 137 U. S. 330, 11 Sup. Ct. Rep. 122. The Starr was not stopped, and, as before stated, she continued to go ahead at her ordinary rate of speed, and was not under command, so that she could be stopped, until it was too late to avert the disaster. Although denied by her master, these damaging facts are shown by the testimony of her other officers, who were called as witnesses in behalf of the respondent. The testimony of the engineer and assistant engineer is to the effect that the signal bells were given in about this order: First, the slow bell, and within the period of about half a minute afterwards the bells to stop, followed immediately by the signal to reverse. Robert McMillan, who was in the pilot-house, acting as wheelsman, testified to the effect that all on board the Starr were startled by the sudden appearance of the Anderson through the fog. On his direct examination, in answer to the question, "Did you hear the captain say anything or make any remark as the Anderson hove in sight?" he answered: "Yes, sir. Just as the Anderson hove in sight, Captain McAlpine told me to put the wheel hard a-port. He says, 'By ——, she is right into us,' and he almost went out of the window."

The master of the Starr insists that the injury to the Anderson was not caused by the Starr running into her, but by the maneuver of the Anderson. He claims that by putting her wheel hard a-port, with her engine driving ahead, so as to swing her stern to port, the Anderson was forced laterally upon her center against the stem of the Starr, and so damaged herself by force of her own motion. This theory is not supported by, but is contrary to, natural philosophy. A demonstration of its fallacy is to be found in the failure of the Starr to move laterally towards the Anderson. The evidence shows that her wheel was suddenly and quickly put hard a-port, when she was going ahead with greater speed than the speed of the Anderson. Although her engines were reversed, she continued to go ahead with great momentum until the collision; and there could be no force which would cause the Anderson to move as Capt. McAlpine asserts, different or greater in degree than the force created by the maneuver of the Starr.

It is claimed that the Anderson was in fault by being out of her proper position on her course from Utsalady to Coupeville, and that she was too near to Rocky point, and that she did not allow enough room for the Starr to pass in safety. The evidence, however, does not show clearly the exact position of the vessels, nor the distance from 'the place of collision to Rocky point, and I am therefore unable to find that the charge is sustained by proof.

It is claimed, in the next place, that it was a fault on the part of the Anderson to stop as she did, instead of proceeding, after the signals to pass to port had been exchanged; that by stopping instead of going forward she misled the master of the Starr, so that when he came in sight of her she was lying across his path, when she should have been a sufficient distance away to have cleared. The testimony shows that the stopping of the Anderson did in fact contribute materially towards bringing the vessels together, and shows that, if the Anderson had kept under way, the collision could not have occurred; but while this is so I cannot condemn as a fault the act of the master of the Anderson in stopping his vessel, for in doing so he obeyed a rule of navigation which the authorities above cited hold to be imperative.

A more serious charge against the Anderson is made in the answer in this: that instead of reversing her engines and backing at the time the Starr came into view, she went ahead. That she did go ahead instead of backing is expressly admitted by the master of the Anderson in his testimony. The rules of navigation require that when two vessels under steam come together, as in this instance, both must reverse their engines and back. If this rule had been observed by the master of the Anderson, but little, if any, damage could have resulted from the collision, and possibly there would have been no actual contact. The excuse given for failure to comply with the rule on the part of the master of the Anderson is that he believed that the only way to prevent the Starr from striking the hull of his vessel in such a way as to sink her was to go ahead, as he did, with his wheel hard a-port, swing to starboard, and so present the timbers of the paddle-box as a fender to receive the blow. But the excuse is insufficient. The vessel was under command, and by placing her helm in proper position and going astern she would have swung in exactly the same way, so that her timbers would have served as a guard, if the effort to avoid the collision proved ineffectual. It was not necessary for the Anderson to go ahead for the purpose claimed; she could have been protected in the same manner by going astern. As both vessels were in fault, the damage resulting must be divided between them. The case will therefore be referred to a commissioner to take further proofs, and to ascertain and report the amount of damage sustained by each vessel, and upon the coming in of the report a decree will be entered in accordance with this opinion.